UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 12-80372-CIV-MARRA/BRANNON

MADELAINE MARTORELLA,
TRACEY LAWRENCE GRAHAM,
and DOROTHY WRIGHT, as
personal representative of the
ESTATE OF ARNOLD ROBINSON,

      Plaintiffs,

vs.

DEUTSCHE BANK NATIONAL
TRUST COMPANY, AS INDENTURE
TRUSTEE FOR AMERICAN HOME
MORTGAGE INVESTMENT TRUST
2006-1, and AMERICAN HOME
MORTGAGE SERVICING, INC.,

      Defendants.

_____/

## ORDER DENYING MOTION TO DISMISS CLAIMS OF GRAHAM & WRIGHT

**THIS CAUSE** is before the Court upon Defendants' Motion to Dismiss the Claims

of Plaintiffs Graham and Wright [DE 213].  The motion is fully briefed and ripe for

review.  The Court has carefully considered all relevant filings and is fully advised in

the premises.

### Introduction

Plaintiffs Madelaine Martorella ("Martorella"), Tracey Lawrence Graham

("Graham"), and Dorothy Wright ("Wright"), as personal representative of the Estate

of Arnold Robinson[1] (collectively "Plaintiffs") bring this action against Defendant

Homeward Residential, Inc. ("Homeward"), f/k/a American Home Mortgage Servicing,

Inc., arising out of Homeward's participation in an alleged scheme to force-place

insurance coverage at grossly excessive and unreasonable prices on properties owned

by Plaintiffs and other Florida homeowners.[2]   Plaintiffs allege that Homeward violated

the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), breached the

covenant of good faith and fair dealing implied in their mortgages, and was unjustly

enriched by force-placing "excessively priced insurance policies that provide less

comprehensive coverage, while keeping a portion of those excessive premiums as

commissions or other remuneration."  *Martorella v. Deutsche Bank Nat'l Trust Co.*,

931 F. Supp. 2d 1218, 1223 (S.D. Fla. 2013) (Marra, J.).

This proposed class action was initially filed by Martorella in state court.  After

removal, Defendants moved to dismiss Martorella's claims.  Defendants' first motion

to dismiss was denied.  *Id*.  About a year later, Martorella sought leave to amend her

complaint to add Graham and Wright as plaintiffs in view of Defendants' attempts to

eliminate her as class representative by way of refunds to her escrow account long

after initiation of the suit.  *See* DE nos. 128, 132, 153, 177.  The Motion to Amend was

---

[1]  Wright is the personal representative of the Estate of Mr. Arnold, who was the mortgagor on the loan.  References to Wright herein, include Mr. Arnold.

[2]  Martorella also has asserted claims against Defendant Deutsche Bank National Trust Company ("Deutsche Bank").  Graham and Wright have not.  Homeward and Deutsche Bank are referred to collectively herein as "Defendants."

granted.  DE 208.

On September 24, 2014, Plaintiffs filed the Amended Class Action Complaint ("Complaint" or "Compl."), which added Graham and Wright as named plaintiffs.  DE 209.  By way of the instant motion, Defendants have moved to dismiss the claims of Graham and Wright (Counts I, V and XI).

## Summary of Facts Pertaining to Plaintiffs Graham and Wright

The following allegations are taken as true for purposes of the instant motion. Graham and Wright are mortgagors of properties located in Florida.  Compl. ¶ 2-3.  At all relevant times, Homeward was the servicer of their loans.  Compl. ¶ 9, 22, 35. When it assumed the servicing of Graham's and Wright's loans, Homeward assumed the servicing obligations under their standard form for mortgages.  Compl. ¶¶ 9, 101.

Under the standard form for mortgages entered into by Plaintiffs, if the homeowner fails to maintain property insurance coverage, Homeward may step in and buy a property insurance policy on behalf of the homeowner so that the home remains insured.  Compl. ¶ 11; DE 213-2 ¶ 5, DE 213-6 ¶ 5.  Such policies are commonly referred to as "force-placed insurance" ("FPI") or "lender-placed insurance" ("LPI").  However, in exercising its rights to protect the lenders' interest in their properties, Plaintiffs allege that Homeward was obligated, but failed, to act in a "reasonable" and "appropriate" or "necessary" manner.  DE 213-2 ¶ 7, DE 213-6 ¶ 9.  It is also alleged that Homeward failed to act consistent with the covenant of good faith and fair dealing implied in the mortgages, which required it to exercise

discretion in good faith and observe reasonable limits consistent with the parties' purpose in contracting.  Compl. ¶¶ 12, 101-111.

In July 2008, Homeward entered into a contract with ZC Sterling Insurance Agency, Inc., now known as QBE First Insurance Agency, Inc. ("QBE"), for QBE to serve as its exclusive LPI vendor.  Compl. ¶ 48.  It is alleged that the process by which Homeward selected QBE is properly characterized as "reverse competition."  Instead of competing for individual consumers, force-placed insurance vendors compete for entities with the market power to steer business to the insurer - *i.e.*, the mortgage servicers - by offering them a variety of financial incentives.  QBE competed for Homeward's business by offering Homeward substantial financial incentives which drove up the cost of LPI to the borrowers.  Compl. ¶ 48.  In exchange for using QBE as its exclusive LPI vendor, QBE agreed:

- ▶ to pay to Homeward a 15% commission on all force-placed insurance premiums;

- ▶ to pay Homeward a lump-sum signing bonus of $9.7 million;

- ▶ to provide insurance, tax and other services to Homeward at a heavily discounted, below-cost price; and

- ▶ to issue warrants to an entity of Homeward's choosing that would give it the right to purchase up to 15% ownership in QBE for nominal consideration.  *Id.*

Plaintiffs call these incentives "kickbacks."  Compl. ¶¶ 43, 48.

It is alleged that to pay for these financial incentives, QBE charged unreasonable, excessive and unregulated LPI rates to Homeward, which Homeward then passed on to its Florida borrowers.  Due to its financial arrangements with QBE,

Homeward had a conflict of interest and never sought to negotiate lower LPI rates for its Florida borrowers.  Compl. ¶ 49-50.

The Complaint refers to a number of documents to support its allegations, including Plaintiffs' mortgages and letters from Homeward to Plaintiffs about LPI. The parties agree these documents may be considered on the instant motion to dismiss.  *See, e.g., Infante v. Bank of America Corp.*, 468 Fed. App'x 918, 921 n.2 (11th Cir. 2012) (mortgage loan documents referred to in complaint can be considered on a motion to dismiss), quoting *Brooks v. Blue Cross & Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) ("where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiffs claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal.").

## Standard of Review

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  In considering a motion to dismiss, a court should first "eliminate any allegations in the complaint that are merely legal conclusions," and then "where there are well-pleaded factual allegations, assume their veracity and [ ] determine whether they plausibly give rise to an entitlement to relief."  *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (internal quotations omitted).

When reviewing a motion to dismiss for failure to state a claim, the Court takes all alleged facts as true and construes them in the light most favorable to the plaintiff. *Butler v. Sheriff of Palm Beach Cnty.*, 685 F.3d 1261, 1265 (11th Cir. 2012). In order to overcome a Rule 12(b)(6) motion to dismiss, a plaintiff must plead "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

<u>Discussion</u>

<u>Plaintiff Graham</u>

Graham mortgaged her property in 2005. Compl. ¶ 34. Graham's mortgage requires her to keep the mortgaged property insured as follows:

5.      **Hazard or Property Insurance**. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term 'extended coverage' and any other hazards, including floods or flooding, for which Lender requires insurance . . . .

The paragraph adds:

If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

Paragraph 7 in turns states that:

7.      **Protection of Lender's Rights in the Property**. If Borrower fails to perform the covenants and agreements contained in this Security Instrument . . . then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property . . . . Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of the Borrower . . . .

DE 213-2.

As part of her loan transaction, at her September 14, 2005 loan closing, Graham also signed a Collateral Protection Insurance Disclosure, which told her (in uppercase letters) that the cost of LPI "MAY BE CONSIDERABLY MORE EXPENSIVE THAN INSURANCE YOU CAN OBTAIN ON YOUR OWN . . . ."  DE 213-3.

The Amended Complaint alleges that Graham was sent letters on July 6, 2011, and September 9, 2011, asking her to confirm that she had her own insurance, and informing her that LPI would be placed on her property if confirmation was not received.  Compl. ¶¶ 36-37.

The July 6, 2011 letter is dated just 8 days after Graham's own insurance lapsed, and states:

> We have been notified that the insurance policy protecting the property . . . has cancelled or expired.  We have not received a new or renewal insurance policy.  Please forward a copy of your policy . . . .

DE 213-4.  The letter further states that "we have secured temporary insurance coverage."  A "90-day Binder" was attached to the letter describing the cost of that policy for the period from June 28, 2011, to June 28, 2012:  $4,979.97.  *Id.*  Her escrow account was charged this amount.  Compl. ¶¶ 36-38.

The July 6, 2011 letter reiterated in bold that the premium for LPI "**may be considerably higher than insurance you can purchase**" and that the coverage would not be as great as that for insurance she could purchase herself.  Graham was also told that the temporary insurance would be cancelled on receipt of her own policy,

although she "will be charged for any gap in coverage between your last insurance policy and your new one."  The letter also discloses that an affiliate of Homeward "will receive a commission on the insurance."  DE 213-4.

The September 9, 2011 letter states in bold that, not having received confirmation that she had her own insurance, "**[a]t your expense, we purchased lender placed hazard insurance to protect our interest in the property.**"  DE 213-5. The letter attached an Additional Named Insured Certificate listing the premium as $4,979.97.  The letter repeated the statements in the earlier letter about the scope of the coverage, that the premium might be "considerably higher" than insurance she could buy, and that Homeward would cancel the policy as of the date she had her own coverage and would charge her only for the period she did not have her own coverage.  It also states again that an affiliate of Homeward would receive a commission.  Graham arranged her own insurance commencing March 5, 2012, covering the period up to March 5, 2013, for an annual premium of $1,541.  When she provided evidence of that coverage to Homeward, Homeward credited her escrow account with $1,564.51.  Compl. ¶ 41.

**Plaintiff Wright/Robinson**

Wright alleges that her decedent Arnold Robinson mortgaged his property in 2004.  Compl. ¶ 21.  Robinson's mortgage contained the same language as that in Graham's mortgage requiring Robinson to keep the property insured.  His mortgage also stated:

> If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. . . .  [S]uch coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property . . . .

DE 213-6.  In addition, the mortgage stated that:

> Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.

*Id*.  The Complaint alleges that Homeward forced LPI on Robinson for the period from January 23, 2012 to January 23, 2013, and his escrow account was charged $7,014.35 for this insurance because it had been unable to confirm that he had maintained his own insurance.  Compl. ¶¶ 24-25.  Wright alleges that Homeward also arranged LPI for Robinson's property for the period from January 23, 2013 to January 23, 2014 and charged his escrow account $6,319.43 for that insurance.  Compl. ¶¶ 29-30.  Wright alleges that on or around June 6, 2013, Robinson's estate provided Homeward with evidence that the property was insured for the period from June 6, 2013 to June 6, 2014, and that Homeward cancelled the LPI it had placed on the property and refunded $3,999.42 to Robinson's escrow account.  Compl. ¶ 31.

With respect to the earlier period, the Complaint refers to letters Homeward sent to Robinson dated January 30, 2012 and April 9, 2012.  Compl. ¶¶ 23-24.  These two letters sought confirmation that Wright had renewed his own insurance and told him that LPI would be placed on his property absent such confirmation.  The first letter is dated just 7 days after Robinson's own insurance lapsed.  The letters ask

Robinson to confirm that he had his own insurance; they tell him that he will be charged for the cost of the LPI; they tell him the LPI will cost $7,014.35; and they state that a Homeward affiliate will receive a commission on the LPI.  DE 213-7, DE 213-8.

With respect to the later period, the Complaint describes a letter dated December 10, 2012 sent to Robinson asking for confirmation that he had insurance.  Compl. ¶ 27.  This letter referred to the LPI Homeward had provided for the period from January 23, 2012 through January 23, 2013, and informed Robinson that Homeward would renew that LPI unless he provided confirmation that he had his own policy.  The letter again told Robinson that a Homeward affiliate would receive a commission on the insurance.

The Amended Complaint also refers to a June 12, 2013 letter to Robinson.  Compl. ¶ 29.  This date is an error: the letter Plaintiffs refer to is in fact dated January 30, 2013 (as the Graham complaint correctly stated at ¶ 29).  This letter included the renewed policy, which stated that the premium would be $6,319.43, it told him that a Homeward affiliate would receive a commission, and it told him that the policy would be cancelled on proof of his own coverage.  DE 213-10.  The insurance placed by Homeward was cancelled effective June 6, 2013, when Wright provided confirmation that she had arranged insurance.  Robinson's escrow account was then refunded $3,999.42.  Compl. ¶ 31.

The Amended Complaint alleges the excessive amounts Homeward charged for LPI were added to Graham's and Robinson's debt and escrow accounts, and caused their monthly mortgage payments to increase substantially.  Compl. ¶ 25-26, 30-33, 38-40.  Plaintiffs complain that Homeward's LPI is astronomically priced and provides less comprehensive insurance coverage than a typical homeowners' policy.  Instead of purchasing less expensive competitively priced policies, mortgage servicers, such as Homeward, place the policies with insurers who pay them commissions, or other remuneration, thus driving up the cost of LPI.  Because there is no arm's-length transaction here, "it creates all sorts of incentives for the services to [] . . . overcharge consumers for policies that provide minimal benefit. . .   Servicers and insurers have turned this into a gravy train."  Compl. ¶¶ 42-44.

**Common features of Plaintiffs' mortgages and letters**

The Plaintiffs' loan documentation and the letters they received from Homeward have the following common features:

(a)     Both Plaintiffs undertook in their mortgages to maintain their own property insurance.

(b)     Both Plaintiffs were informed in their mortgages that if they allowed their insurance to lapse, the Lender could take steps necessary to protect its interest in the property, including taking out LPI and charging Plaintiffs for that insurance.

(c)     Both Plaintiffs were informed in writing that the cost of LPI might be "considerably" or "significantly" higher than the cost of insurance the Plaintiff could arrange, and might offer less coverage.

(d)  Both Plaintiffs were sent letters concerning LPI just a few days after each Plaintiff's own insurance lapsed:  8 days for Graham; 7 days for Robinson.

(e)  These letters told Plaintiffs the precise cost of the LPI.

(f)  These letters also told Plaintiffs that a Homeward affiliate "will receive a commission" on the insurance.

(g)  And the letters told Plaintiffs that the LPI would be cancelled as of the date they arranged their own coverage and the premium for the cancelled period would be refunded.

## Overview of Claims

Plaintiffs assert three different legal claims in the Complaint.  They allege that (1) Homeward violated the FDUTPA (Count I); (2) Homeward breached the mortgage agreements and the covenant of good faith and fair dealing implied therein (Count V); and (3) Homeward was unjustly enriched (Count XI).  Plaintiffs bring this case for themselves and on behalf of a class of all persons within the state of Florida who have or had residential mortgages serviced by Homeward and for whom Homeward purchased LPI through QBE between July 1, 2008 and March 31, 2013.  Compl. ¶ 56, DE 226, n.7.  Defendants move pursuant to Rule 12(b)(6) to dismiss the claims of Graham and Wright asserted in the Complaint.  They argue (1) that the FDUTPA claim fails because Plaintiffs do not (and cannot) plead that Defendants owed them a duty of loyalty, (2) that their case is about insurance and FDUTPA states on its face that it does not apply to insurance matters, (3) that the breach of contract fails because Homeward was not a party to the mortgage agreements, and (4) the unjust

enrichment claim fails because Plaintiffs have not alleged that they lack a legal remedy if they were able to prove that they were overcharged.

I.      **FDUTPA Claim**

Defendants assert that the Complaint does not state a FDUTPA claim because it (a) does not plead a "deceptive act" or an "unfair practice;" (b) does not plead the causation element of FDUTPA; (c) Defendants did not owe Plaintiffs a duty of loyalty; and (d) the insurance exemption under the FDUTPA claim applies.

A.      **Unfair Practice**

Applying the more recent definition (as opposed to the historical definition)[3] of an "unfair practice" requires that the injury to the consumer: (1) must be substantial; (2) must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and (3) must be an injury that consumers themselves could not reasonably have avoided.  Federal Trade Commission Act, § 5(n), 15 U.S.C.A. § 45(n); Fla. Stat. §§ 501.202(3), 501.203(3)(b), 501.204(1, 2). *Porsche*, 140 So. 3d at 1096.  Defendants argue "Plaintiffs here could of course have 'reasonably avoided' the injury they allege - *i.e.*, the premiums for the LPI Homeward

---

[3] *Porsche Cars N. Am., Inc. v. Diamond*, 140 So.3d 1090, 1096-98 (Fla. Dist. Ct. App. 2014) ("*Porsche*") *review denied*, No. SC14-1375, 2014 WL 7005011 (Fla. Dec. 11, 2014), holds that the state legislature intended courts to use the Federal Trade Commission's ("FTC") latest definition of "unfairness" in applying FDUTPA, as opposed to the "historical" definition.  *Porsche* propounds a three-part definition from a 1980 FTC policy statement that supplants the historical definition, derived from a 1964 FTC policy statement.  *Christie v. Bank of Am., N.A.*, No. 813-CV-1371-T-23TBM, 2014 WL 5285987, at *4 (M.D. Fla. Oct. 15, 2014).

arranged - by either respecting their contractual undertaking to maintain their own insurance or, when Homeward informed them that it had placed LPI, arranging their own coverage."  DE 213 at 16 of 27.

This argument operates from an incorrect view of the allegations.  While Plaintiffs might have avoided the lender-placed insurance in the first instance, it is not the placement of the insurance that constitutes the basis for the claim.  Rather, it is the charging of *excessive and unreasonable amounts for LPI* that were unrelated to the provision of that insurance, while keeping a portion of those charges as commissions or other remuneration, that states a claim under the unfairness prong of the FDUTPA.  Once the LPI was acquired, Plaintiffs could not avoid the allegedly exorbitantly priced insurance until they procured their own insurance.

**B.**   **Causation**

Defendants next argue that Plaintiffs have not adequately pled the causation element of the FDUTPA:  Plaintiffs "were not forced <u>into</u> LPI; they were not forced <u>to</u> <u>stay</u> with LPI; and so they were not forced <u>to pay</u> a premium for that LPI that they now allege was excessive.  It follows that they have not pleaded, and cannot plead, the causation element of FDUTPA."  DE 213 at 17 of 27 (emphasis in original).  Defendants challenged causation previously in their first Motion to Dismiss, which argument the Court rejected.  See *Martorella v. Deutsche Bank Nat. Trust Co.*, 931 F. Supp. 2d 1218, 1224 (S.D. Fla. 2013).  Their argument in this regard is rejected again.

Plaintiffs have alleged that Homeward's unfair practices caused them damage when Homeward charged them grossly excessive and exorbitant amounts for LPI. These amounts were added to Plaintiffs' debt, charged to Plaintiffs' escrow accounts, and resulted in significant increases in their monthly mortgage payments.  Compl. ¶¶ 25-26, 30-33, 38-40.  Plaintiffs have also alleged that the amounts charged were excessive and unreasonable as a result of Homeward's exclusive and collusive relationship with QBE whereby QBE would provide commissions, warrants, below-cost services, lump-sum payments, and other remuneration for Homeward's business. Compl. ¶¶ 48-54.  Plaintiffs have sufficiently alleged causation because the harm they suffered was the foreseeable result of Defendants' alleged conduct.

**C.**    **Duty of Loyalty**

Defendants argue that Plaintiffs' allegations of unfair practices also fail because Plaintiffs do not allege that Defendants owed them a duty of loyalty.  For this argument, Defendants rely on a recent LPI decision which holds that commissions or other payments from an insurer could only be considered "kickbacks" if the recipient had a duty of loyalty to the borrower on whose property the insurance was being placed.  *See Feaz v. Wells Fargo Bank. N.A.*, 745 F.3d 1098, 1111 (11th Cir. 2014) ("*Feaz*").

First, whether the payments or other incentives allegedly received by Homeward for purchasing the LPI from the insurer meets the legal definition of a "kickback" is not essential to the claim.  The basis for the claim is the allegedly

improper financial inducements paid by the insurer to Homeward which unreasonably and unfairly increases the cost of the insurance to the borrower.

Second, *Feaz* addresses lender-placed flood insurance in the context of a claim for breach of fiduciary duty under Alabama law.[4]  Thus, not only was the substance of the plaintiff's lender-placed insurance claims in *Feaz* materially different than Plaintiffs' claim here, but Florida law is distinct from Alabama law in the lender-placed insurance context.[5]  *Hamilton v. Suntrust Mortgage Inc.,* 6 F. Supp. 3d 1300, 1311 (S.D. Fla. 2014); *Feaz*, 745 F.3d at 1100-01.  Accordingly, the motion to dismiss based on the argument that Defendants did not owe Plaintiffs a duty of loyalty is denied.

---

[4]  The Eleventh Circuit did agree with the Seventh Circuit's declaration that "simply calling a commission a kickback doesn't make it one.  The defining characteristic of a kickback is divided loyalties.  But [the lender] was not acting on behalf of [the borrower] or representing her interests.  The loan agreement makes it clear that the insurance requirement is for the lender's protection." *Id.* at 1111 (alterations in original) (quoting *Cohen v. American Security Insurance Company*, 735 F.3d 601, 611 (7th Cir. 2013)). However, the Court made this pronouncement *with regard to a claim for fraud and violations of fiduciary duty, not breach of contract and breach of the implied covenant of good faith and fair dealing*.

[5]  "Under Alabama law, 'sole discretion' means an absolute reservation of a right.  It is not mitigated by an implied covenant of good faith and fair dealing in contracts because an unqualified reservation of a right in the sole discretion of one of the parties to a contract expresses the intent of the parties to be subject to terms that are inconsistent with any such implied covenant." *Feaz*, at *8-9 (citing *Shoney's LLC v. MAC East, LLC*, 27 So.3d 1216, 1220 (Ala. 2009)).  In contrast, under Florida law, the implied covenant of good faith applies "even where the contractual obligation is one subject to the 'sole discretion' of one of the parties."  *Dept. of Revenue v. Gen. Motors LLC*, 104 So.3d 1191, 1198 (Fla. Dist. Ct. App. 2012) (citation omitted).

D.    <u>Insurance Exemption</u>

Defendants next argue that Plaintiffs' FDUTPA claim is barred because Plaintiffs' Complaint concerns insurance and FDUTPA does not apply to insurance.[6] The express language of Fla Stat. § 501.212(4) creates a specific exemption from suit under FDUPTA for "(a) [a]ny person or activity regulated under laws administered by ... [t]he Office of Insurance Regulation of the Financial Services Commission, . . . or (d) Any person or activity regulated under the laws administered by the former Department of Insurance which are now administered by the Department of Financial Services."  Florida courts resolve questions about the applicability of this provision by looking to the activity which is the subject of the lawsuit, and whether that activity is subject to the regulatory authority of the Office of Insurance Regulation ("FLOIR") or Department of Financial Services.  *See W.S. Badcock Corp. v. Myers,* 696 So.2d 776, 782–83 (Fla. Dist. Ct. App. 1996).

Defendants urge the Court to resolve the question of whether Plaintiffs' FDUTPA claims are barred by looking at five specific factors enumerated in *Professional Lens Plan. Inc. v. Dep't of Ins.*, 387 So.2d 548, 550 (Fla. Dist. Ct. App. 1980).  This level of analysis requires resort to a factual analysis beyond that presented by the Complaint and the Court cannot engage in such an analysis at this

---

[6]  "'Insurance' is a contract whereby one undertakes to indemnify another or pay or allow a specified amount or a determinable benefit upon determinable contingencies."  Fla. Stat. § 624.02 (2015).

stage.  Moreover, if Homeward is regulated by the FLOIR or the Department of

Financial Services, such evidence should be readily available to Homeward and the

question of exemption may easily be resolved on a motion for summary judgment.[7]

## II.   Claim for Breach of Contract and Breach of the
## Implied Covenant of Good Faith and Fair Dealing

Defendants argue that since it was not a party to the mortgage contract, the

Complaint does not state a claim for breach of contract or breach of the implied

covenant of good faith and fair dealing against it.  "Plaintiffs attempt to fill this gap

in their breach of contract claim by a theory of 'imputed privity' (*id*. ¶ 101) . . .

[which] pleads legal conclusions . . . not facts, and so is to be given no weight on a

motion to dismiss."  DE 213 at 23 of 27.  Defendants argue that as the lender's agent,

it is not liable for its principal's contractual obligation.  *Id*.

Plaintiffs first point out that Homeward is attempting to avoid liability by

arguing positions that conflict with positions Homeward has taken throughout this

case.  For instance, in its first motion to dismiss, Homeward argued that "[n]o party

contests the existence of the contract governing this dispute."  DE 7 at 16.  Plaintiffs

also take issue that Homeward successfully argued that Ms. Martorella is not entitled

to a jury trial based upon certain language in her mortgage.  Plaintiffs state that if

---

[7] *But see, Abels v. JPMorgan Chase Bank, N.A.*, 678 F. Supp. 2d 1273, 1277-78 (S.D. Fla. 2009) ("The OIR only regulates insurance companies, and Florida Statute 627.371 only applies when a person challenges a rate issued by an insurer.")

their claims against Homeward are extra-contractual as Homeward now contends,

then they are entitled to a trial by jury.

In addition to this Court's earlier decision in this case sustaining a claim for

breach of contract and breach of the implied covenant of good faith and fair dealing

against Homeward, *Martorella*, 931 F. Supp. 2d at 1225-26, to date, there have been

at least four LPI class actions against mortgage servicers in this district where claims

for breach of contract and breach of the covenant of fair dealing have been sustained

under Florida law.[8]

---

[8] *See Persaud v. Bank of Am., N.A.*, No. 14-21819-CIV, 2014 WL 4260853, at *9 (S.D. Fla. Aug. 28, 2014) ("Defendants' attempt to distinguish BOA and Nationstar as mere servicers of the Mortgage to avoid liability is likewise unavailing on a motion to dismiss. . .  In short, it is premature to dismiss all claims predicated on a theory of successor liability 'without allowing the facts to develop' in discovery"); *Montoya v. PNC Bank, N.A.*, No. 14-20474-CIV, 2014 WL 4248208, at *12 (S.D. Fla. Aug. 27, 2014) ("Plaintiffs here need not show a specific breach of the contract to allege a breach of the implied covenant of good faith as long as there is a viable contract in effect and the alleged breach concerns the contract"); *Wilson v. EverBank, N.A.*, – F. Supp. 3d. –, No. 14-CIV-22264, 2015 WL 265648, at *14 (S.D. Fla. Jan.6, 2015) (claim for breach of the mortgage contract allowed to proceed even though the mortgage authorized EverBank to force-place insurance.  The mortgage contained no express provision allowing EverBank and/or the servicer to include the cost of kickbacks and other alleged costs in the price of premiums paid by borrowers); *Williams v. Wells Fargo Bank N.A.*, No. 11-21233-CIV, 2011 WL 4901346, at *4 (S.D. Fla. Oct. 14, 2011) ("Whether Wells Fargo Bank is the loan owner, servicer, or both, is irrelevant at this stage. Taking Plaintiffs' allegations as true, Wells Fargo is bound by the mortgage contracts, and any argument to the contrary fails at this motion-to-dismiss stage. Plaintiffs' allegations that Wells Fargo Bank, a party to the mortgage contracts, acted in bad faith in contravention of Plaintiffs' reasonable expectations under those contracts, sufficiently allege a claim for breach of the implied covenant.") Defendants cite six cases that they assert hold that a loan servicer is not a party to the deed of trust.  These six cases are all from different districts, and none are from the Southern District of Florida, or the Eleventh Circuit Court of Appeals.

Pursuant to a Servicing Agreement dated March 29, 2006, the mortgagee in this case conferred a partial assignment of the servicing rights of the mortgage to Homeward.  Am. Compl. ¶¶ 5, 47.  If an original mortgagee can be sued under state law for breach of contract, so may the partial assignee if it violates the terms of the part of the mortgage contract that has been assigned to it.  *See In re Ocwen Loan Servicing, LLC Mortgage Servicing Litigation*, 491 F.3d 638, 645 (7th Cir. 2007).  Plaintiffs have more than plausibly pled Homeward's liability under the form mortgages relating to Homeward's servicing of the their loans.

III.   **Unjust Enrichment**

 Defendants move once again to dismiss Plaintiffs unjust enrichment count.  In its earlier ruling, this Court denied Homeward's motion to dismiss the unjust enrichment claim, recognizing that a party may plead in the alternative for relief under an express contract and for unjust enrichment.  *Martorella*, 931 F. Supp. 2d at 1228.  Defendants have made no new argument that has convinced the Court to depart from its earlier ruling.  According, the motion to dismiss the claim for unjust enrichment is denied.

**Conclusion**

Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss the Claims of

Plaintiffs Graham and Wright [DE 213] is denied.

      **DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County,

Florida, this 5th day of August, 2015.

                               _____

                               KENNETH A. MARRA
                               United States District Judge